UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



ANITA GUPTA,

 Plaintiff,

v.

BANK OF AMERICA SECURITIES, LLC,
DOUG GALLAGHER and PETER SPENCER,
Individually

 Defendants.



C. : :08 CIV 7692

## NOTICE OF REMOVAL (FEDERAL QUESTION JURISDICTION)

Under 28 U.S.C. §§ 1331, 1441(b) and 1446 and Local Civil Rule 81.1, and for the sole

purpose of removing this matter to the United States District Court for the Southern District of

New York based on this court's original jurisdiction to hear and decide federal questions,

Defendant Bank of America, N.A. ("Bank" or "Defendant") (which was incorrectly named and

spelled in the Complaint as "Bank of America Securities, LLC") states:

 1. State Court Action

The plaintiff, Anita Gupta, ("Plaintiff") filed this action against Defendant in the New

York State Supreme Court, County of New York, Index No. 08111074, on or about August 13,

2008. Copies of the Summons and Complaint served on Defendant's statutory agent on or about

August 13, 2008 are attached as Exhibit 1. These documents constitute all "process, pleadings

and orders" served upon Defendant in the state court action.

 2. Federal Question

In the Complaint, Plaintiff alleges that the defendants, Bank, Doug Gallager, and Peter

Spencer, unlawfully terminated her and retaliated against her in violation of the federal Family

and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. Thus, under 28 U.S.C. §1331, the

above district court has federal question jurisdiction over Plaintiff's FMLA claims. With respect

NWK 214855.1

to Plaintiff's remaining claim of sex and gender discrimination under New York City Human Rights Law, NYC Admin Code § 8-107(1)(a), the above district court has supplemental jurisdiction over these claims in accordance with 28 U.S.C. §1367(a).

3.      Timeliness of Notice of Removal.

Defendant first received notice of the Complaint when it and the Summons were served on Defendant on or around August 13, 2008. Removal of this action is, therefore, timely under 28 U.S.C. § 1446(b).

4.      Venue.

The United States District Court for the Southern District of New York is the District Court of the United States within which Plaintiff's state court action is currently pending.

5.      Notice to State Court.

A copy of this Notice of Removal is being filed with the Clerk of the Supreme Court of the State of New York, New York County.

6.      Relief Requested.

Defendant requests that the United States District Court for the Southern District of New York assume jurisdiction over the above-captioned action and issue such further orders and processes as may be necessary to bring before it all parties necessary for the trial of this action.

Defendant Bank of America, N.A.
By and through its attorneys,
EDWARDS ANGELL PALMER &
DODGE LLP

Dated: September 2, 2008

Ivan Novich, Esq.
One Giralda Farms
Madison, NJ 07940
Telephone No. (973) 921-5227
Fax No. (888)325-9515
inovich@eapdlaw.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------x

ANITA GUPTA

              Plaintiff,

    vs.

BANK OF AMERICA SECURITES, LLC
DOUG GALLAGER and PETER SPENCER, Individually

              Defendants,
------------------------------------------------------------x

**Summons** 08111074

Index No.:

FILED

AUG 1 3 2008

COUNTY CLERK'S OFFICE
NEW YORK

**To the above named Defendant's:**

     **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and
to serve a copy of your answer, or, if the complaint is not served with this summons, to
serve a notice of appearance, on the Plaintiff's attorney within twenty (20) days after the
service of this summons, exclusive of the day of service (or within thirty (30) days after
the service is complete if the summons is not personally delivered to you within the State
of New York); and in case of your failure to appear or answer, judgment will be taken
against you by default for the relief demanded in the complaint hereto attached.

The basis of the venue designated is CPLR § 503 (a) in that the Defendants principal
place of business and residence is in this county.

**Defendants' Addresses:**
Bank of America Securities, LLC
Doug Gallager
Peter Spencer
One Bryant Park
19th Floor
New York, NY 10036

                               LAW OFFICES OF DWANE SMITH PLLC

                By: _____
                          Dwane Smith, Esq.
                          Attorney for Plaintiff
                          236 West 26th Street, Suite 303
                          New York, New York 10016
                          Tel: (212) 736-2624

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x

ANITA GUPTA

              Plaintiff,

    vs.

BANK OF AMERICA SECURITES, LLC
DOUG GALLAGER and PETER SPENCER, Individually

              Defendants,

------------------------------------------------------------x

**COMPLAINT**

Index No.: 08111074

Plaintiffs Demand a
Trial By Jury

    Plaintiff, Anita Gupta ("Gupta" or "Plaintiff"), by its attorneys, the Law Offices of Dwane Smith PLLC, as and for its Complaint against defendants Bank of America Securities, LLC ("BOA") and Doug Gallagher, Individually, ("Gallagher") and Peter Spencer, individually ("Spencer") (collectively herein after referred to as the "Defendants"), alleges as follows:

### THE PARTIES

    1.  Plaintiff Gupta was and is an individual who resides at 305 West 52nd Street. Apartment 2H New York, New York 10019 and who worked for BOA for at least 12 months and in excess of 1,250 hours within the preceding 12 month period.

    2.  Upon information and belief, defendant BOA, was and is a corporation duly organized and existing under the laws of New York, with its principal place of business located at One Bryant Park, 19th Floor, New York, New York 10036 and employs 50 or more employees.

FILED
AUG 13 2008
COUNTY CLERK'S OFFICE
NEW YORK

1

3. Upon information and belief, defendant Gallagher was and is an individual who upon information and belief resides in the state of New York.

4. Upon information and belief, defendant Spencer was and is an individual who upon information and belief resides in the state of New York, and who still works with or for BOA.

5. Except as hereinafter specifically described, Defendants, and each of them, were and are acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents, alter egos, and/or employees of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together.

## JURISDICTION AND VENUE

6. This is a civil action seeking damages and monetary relief for unlawful termination under the Family and Medical Leave Act, 29 U.S.C.A §§ 2617, *et seq.*, and other related causes of action.

7. This Court has original jurisdiction under CPLR 325(b) because it is expressly listed as a Court with unlimited jurisdiction.

8. This Court has personal jurisdiction over BOA because it resides in and/or is doing business in this State and County; it has intentionally engaged in acts targeted at this County that have caused harm in this County; and it has purposely availed itself of the privilege of conducting activities in this State and County. In addition, many of the wrongful acts complained of herein occurred in this State and County .

9. This Court has personal jurisdiction over Gallagher because he resides in

2

and/or is doing business in this State and County it has intentionally engaged in acts targeted at this County that have caused harm in this County; and it has purposely availed itself of the privilege of conducting activities in this State and County. In addition, many of the wrongful acts complained of herein occurred in this State and County

10. This Court has personal jurisdiction over Spencer because he resides in and/or is doing business in this State and County it has intentionally engaged in acts targeted at this County that have caused harm in this County; and it has purposely availed itself of the privilege of conducting activities in this State and County. In addition, many of the wrongful acts complained of herein occurred in this State and County.

11. Venue in this County is proper under CPLR 503(a) because this is a judicial County in which a substantial part of the events giving rise to the claim occurred, and/or this is a judicial District in which the Defendants BOA and Spencer reside or may be found.

## FACTUAL ALLEGATIONS

12. BOA hired Gupta as a developer in its information technologies group on or about February 28 2005.

13. The hiring decision was made only after extensive interviews, which included a written test (one interview alone was over three hours). At the time Gupta was hired, the Hiring Manager was Mr. Fabian Zabatta ("Zabatta"), who had interviewed her, along with other managers including Mr. Doug G. Gallager ("Gallager") and Spencer.

14. As an inducement to accept the position, Gallager had promised Gupta that her compensation "would be $200,000 a year including salary and bonus." Gallager was basically the over-all head of the operative groups at issue in the matters complained of

3

herein and was instrumental in making and executing all decisions, including those certain unlawful actions complained of herein.

15. Initially, Gupta reported to Zabatta and the employee-employer relationship went very well, with Gupta consistently exceeding expectations and receiving very good reviews.

16. Gupta immediately was given responsibilities for several high profile projects and was commended for her work on the projects, including several of which she had taken the lead on.

17. A few months after she started working at BOA, in the context of a situation that did not involve Gupta, Zabatta told Gupta that, "the group frowns on employees taking a leave" and further stated "it would affect bonuses."

18. Zabatta continued in that conversation to tell Gupta that, in sum and substance, he personally "*did not like how BOA retaliated against employees who took the leaves that they were entitled to take, but that's the way it is here.*" In particular, Zabatta referenced past adverse actions BOA had taken against employees who had taken time off connected with having a baby.

19. In October of 2005, Gupta became ill. She saw many doctors, who administered a lot of antibiotics. Her liver became damaged. She became unable to work; accordingly, she arranged, upon approval of her manager, Mr. Zabatta, to take a leave from work to seek further treatment.

20. Medical records show that Gupta suffered from liver malfunctions, yeast infections, and complications from increased hormones. During the leave, Gupta went

4

back home to India and received treatment from doctors qualified to deal with her health issues.

21. Gupta returned to work on the return date that her manager had approved. However, BOA did not pay Gupta any bonus for that year—although Gallager had informed her prior to the leave that based upon her work she was certain to receive at least a $20,000 bonus.

22. When Gupta reminded Gallager about his earlier comment, he was dismissive, but did not directly respond with any sensible answer, saying, instead, "Oh, that was a just number."

23. BOA's decision not to pay the bonus appeared to be in retaliation for the medical leave that she had taken, especially in light of the comment that Zabatta had made, when he had, in effect, warned her about the group's practice of "punishing" employees who took leaves, saying that "it affected their bonuses".

24. During that year, Gupta had created an application known as "Realm." It was a reporting application that all of the traders used and still use. The concept was Gupta's alone—moreover, she prototyped it and demonstrated it and when it was released, it was very well received.

25. Zabatta had told her that she had "kicked ass" developing it. Gallager had said based on Realm that BOA could achieve "world domination".

26. Realm was but one project that Gupta had succeeded on that year and was one of several reasons that Gupta had believed Gallager when he had promised the $20,000 bonus for her work that year.

5

27. There were no other intervening circumstance, and BOA's sole basis for changing its mind and not paying any bonus to Gupta in 2005, in spite of the record of her achievement, was the leave she had taken for medical reasons, which had been an approved leave.

28. Gupta made her feelings and beliefs known to her supervisor at the time, as to why she thought that her bonus had been revised to zero: that it was punishing her for taking the leave.

29. However, as an integral part of the group, Gupta continued in her career with Company.

30. A peer of Gupta, Ms. Claudia Chen ("Chen"), along with other managers, was in a group of developers working on P&L applications. Chen's group included Spencer and Gallager, again with Gallager being the over all decision-maker.

31. Chen became pregnant in 2006, went on maternity leave, and had her baby on September 20, 2006. While Ms. Chen was out on maternity leave, it was common knowledge, and even acknowledged out loud by some members of her group, including without limitation, in front of Gupta, that Chen, had in effect, "cut her own throat" and "committed corporate suicide," by availing herself of the full time allotted her for maternity leave (which, apart from applicable law, Company's own policies provide for).

32. Gupta had, in fact, inquired about this point during her interviews with Company and was told, as inducement to become an employee, that the Company provided family leave as part of its benefits package.

6

33. Chen returned from maternity leave on January 1, 2007. She met with Mr. Steve Beasty ("Beasty"), the Head of the Technology Department. Beasty informed Ms. Chen that her bonus was going to be cut in half.

34. The work that Chen had done prior to her maternity leave was re-credited to Spencer.

35. Chen spoke candidly to Gupta during this time period. Ms Chen reports that she was made to feel unwelcome and not needed, at best, when she returned to work. The Company acted as if she had made her choice to have a baby, rather than stay with the team.

36. Chen was constructively discharged. Chen's experience was consistent with the cautionary warning from Zabatta: the department's *de facto* procedures in actual application, notwithstanding Company's ostensible policies to the contrary, was to mete out to those employees who took a leave, to which they were entitled, retribution and retaliation.

37. The *de facto* policy, coupled with the announcement of the policy to subordinates (such as by Fabazza to Gupta), was calculated so as to have a chilling effect on employees from exercising their protected right to take a leave.

38. BOA made it clear that if you take a leave, especially if that leave is a maternity leave, you forfeit your bonus or face other adverse employment action.

39. In particular, BOA displayed a chronic and pervasive concern that women employees might take a leave to have a child, which explains why only two women were ever employed in the relevant group during all the time involving plaintiff's employment with Defendants.

7

40. Chen and Gupta were in fact the only two women in the whole group, until Chen left (and both did have babies and both did suffer discrimination from Company as a result).

41. Shortly thereafter, Zabatta left the Company and Spencer was transferred to London.

42. Gupta then reported to Srini.  While reporting to Srini, Gupta received wonderful reviews, a $5,000 raise and was paid a bonus of $35,000.

43. Gupta was committed to moving forward with her career within the Group, when on January 24, 2007, she found out that she was six weeks pregnant.

44. Gupta immediately felt concerned for her job security, having just witnessed what had happened to Chen and having heard Chen's side of the story as to what she had gone through.

45. Gupta spoke with Chen and Chen shook her head and advised that Ms. Gupta should "just enjoy the baby."

46. Early in her pregnancy, Gupta informed her supervisor at that time, Srini, that she was pregnant.  She also confided to him that she was afraid to take the leave she felt she should take and to which she was entitled, when the time came.

47. Srini stated that he understood her concern and was not surprised by it.  Srini assured her that she need not worry about it, and that the issue of her leave would be dealt with at the time.

48. While pregnant, Gupta faced an ever-increasing work-load, due in part to several departures from her group of colleagues.  The group had about half the resources it had before the several departures on short notice (after the bonuses were paid).

49. Gupta was called upon to work additional hours and cover a rotation, which required regularly working late.  In July 2007, Srini went on a vacation safari to Kenya and left specific orders for Gupta, all of which she complied with.

50. By summer 2007 Gupta had filed her notice to take the maternity leave and her pregnancy was visible.

51. Spencer, transferred back from London and reported to Gallagher, who in turn reported to Mr. Scott Burton ("Burton").  Spencer began criticizing Gupta, and issuing directives to her, which directives were in direct conflict with instructions that her boss, Srini, had left for her.

52. Gupta suggested that they wait until Srini returned.  Instead, Mr. Spencer said that he 'would go over Srini's head" to Gallagher.

53. A meeting occurred at which, for the first time, Gupta was informed by Gallager that she no longer reported to Srini but to Spencer.  The change in reporting had been in effect when Spencer returned from London and apparently coincided with Srini's vacation.

54.  No one at BOA—neither Spencer nor Gallager--had informed Gupta about the change in reporting or that she no longer reported to Srini, but rather to Spencer.

55. Gupta was almost seven months pregnant, and it was common knowledge that she would be taking a leave of absence when the child was born, when BOA changed the manager to whom she reported, *but did not tell her for several weeks.*

56. Gupta continued to work until the day her water broke on September 10, 2007. She went into the office the day her water broke (after it broke), knowing she was in labor.

9

57. Gupta went in to change her laptop battery that had died, so as to be available to the group while she was out and also to explain some code to a colleague.

58. Gupta took her leave of absence for maternity, filled out and turned in her FMLA forms, acknowledged by her doctors, and had her baby.

59. The project, Realm, which Gupta had been on the front-end of, was spun off into a separate group. When she returned to work, she was told not to work on Realm.

60. Approximately one week elapsed after Gupta returned to work before she could get a meeting with Spencer, her boss.

61. Spencer provided Gupta with directions that made no sense and in fact were detrimental to projects. Mike Frantz, who worked on certain projects that Gupta had been involved, was heard by Gupta to say upon her return to Gallager and Spencer, that he and the rest of the group did not care if she "sat and twiddled her thumbs" (apparently response to whatever directives they were giving him about her).

62. Gupta received no year-end review and no bonus. She was directed to participate in interviewing candidates for a job that matched her job description.

63. Gupta had in fact seen the ad posted describing her position while out on maternity leave, for which she was at that time interviewing candidates.

64. No one at BOA was giving her work to do and everyone was keeping a good distance from her.

65. The prevailing attitude that Gupta was subjected to is best summed up as: "Why did you try to come back, when you know how this group feels about maternity leave and motherhood issues?"

66. Gupta had inquired about lactation facilities while on leave, in advance of her

10

return, and through an exchange of emails with Spencer, she was told that preparations had been made for a lactation room (BOA was building one which would be ready before her return).

67. The lactation room was on 43rd floor of 1133 6th Avenue, Gupta's desk was on the 40th floor.

68. The entire 43rd floor was under construction. No desk was occupied. There was a construction crew every day.

69. Before returning to work, Gupta had given her boss her cardkey code in order for him to arrange for her to get access to 43rd floor and Spencer informed Gupta that he had gotten it.

70. On Dec 7, 2007, Gupta took her nanny to her office to show her where she was, so that the nanny would be able to bring the baby to the office to nurse. The cardkey did not work on the 43rd floor. Gupta again told Spencer about it and he again said that he would take care of it.

71. On December 10th 2007, she returned again to check the facility and her cardkey still did not work.

72. Finally access to the lactation room was arranged and Gupta was able to use the lactation room. Afterwards, she left the breast pump and equipment there. There was one other lactating employee, who had been using the room, but stopped upon Gupta's arrival and commencement of using the facility.

73. On December 11, 2007, Anita was at court on a child custody case involving her new baby.

74. Upon her return to work on December 12th, there were 2 voice messages,

11

which said, "the breast pump will be thrown out if she did not get them out by December 11[th] at 4 pm."

75. Gupta ran to the desk of the person who had left the messages and was told that the room that BOA had informed her was a lactation room "was not a lactation room." Gupta would be allowed to use it, but she would have to make reservations for it to do so.

76. During a meeting with Spencer on Dec 14th, 2007 he told her that he wanted her to share the room with a Muslim who wanted to use it as a Prayer room. As she was having a hard enough time with the process, she said that since she was making reservations for it, she preferred not to share it during that time. He also told her that she would have to work late every evening to make up for her two lactation breaks.

77. Gupta made reservations twice a day. She could not leave the bottles and funnels in the locker outside the room because they needed to dry. She would wash them, and since she was not allowed to leave them in the room to dry, she would bring then down to her desk and leave them to dry there.

78. Gupta felt that this process was demeaning and humiliating. She informed Spencer's assistant, Liz Kelsey, as much in an email and Ms. Kelsey replied that nothing could be done due to "management policy." Gupta felt humiliated by BOA.

79. Gupta was locked out of the 43rd floor several more times, which prevented access to the lactation room. The last time was on February 1st, 2008 and upon inquiry, she was told, inexplicably, that her "account had been dropped" with no further explanation. She wondered if she had been fired.

80. She was able to access the 43rd floor on a few occasions, including on the

morning of February 1, 2008 only because she banged on the door and male construction workers let her in.

81. However, there was no one on the 43rd floor in the afternoon on February 1st to let her in. Gupta made numerous calls in an attempt to get into the room.

82. Gupta was concerned that she would not be able to retrieve the milk that she had expressed that morning and that there would be nothing for her baby for the following business day. Finally at 5 pm, due to her persistence, Company re-activated her card, and she retrieved the milk. However, she was unable to express that afternoon as she had been denied use of the facility.

83. Gupta found the entire process relating to her request for lactation accommodations and Company's response to her request fraught with so many difficulties that she was effectively denied regular use of facilities.

84. Company denied Gupta any bonus when they were paid in early 2008 for the year 2007, while Defendants were clearly fully engaged in the process of replacing her, instead of allowing her to return to work after her FMLA maternity leave.

85. The atmosphere that Gupta was met with upon her return to work was hostile and non-cooperative. No one talked to her.

86. The difficulties with the lactation facilities and the needless obstacles that were consistently part of her attempts to use the facility, as set forth above, coupled with the simultaneous removal from Gupta by BOA from any work that she was doing prior to maternity leave, all of which seemed to have been reassigned to other male employees, who would not (or were forbidden) from discussing it with her, gave a clear impression to Gupta that management in her group had no real or good faith intention of allowing her to

13

return to work after her leave.

87. It was clear to Gupta that like Chen, BOA hoped that she would quit and succumb to its campaign directed at her aimed at preventing her from returning to work as a new mother after her maternity leave.

88. The foregoing complained of conduct appeared discriminatory to Gupta, who believes, and who has every reason to believe, that such conduct was meant to harass and annoy her to the point where she would to just quit, much like Chen had been driven out. Specifically, Gallager and Spencer were at the helm of defendants' efforts – with Gallager in charge and ultimately responsible and with Spencer working in concert with him and carrying out his orders.

89. Company's operative policy appears clearly to have been to deny Gupta her right to return to work and to try to constructively terminate her so as to avoid actually terminating her, by creating unbearable work conditions including without limitation, humiliating her.

90. Gupta did not resign and BOA terminated her within weeks of her attempted return to work.

91. BOA listed for its termination of Gupta was a "lay-off." However, there was no downsizing in BOA's work force. No one else was laid off. Her position was filled and Company had begun the process of filling it as soon as Gupta left for maternity leave by advertising for applicants for it.

92. Gupta's replacement was a male, as was the replacement for the only other woman who had been in the group, Chen.

93. The "lay-off" rationale is clearly and unequivocally nothing more than a

14

pretext by BOA to terminate Gupta for unlawful reasons.

94. When Gupta was fired BOA handed her forms to fill out, "in case she wanted to sue their pants off" in the words of Gallager, who handed them to her.

95. Gupta did not sign the papers provided to her by Gallager.  No package was offered to her in consideration of her termination.  Company told to her to stop work and remove her things immediately but said that she would continue to receive checks for another a few pay-periods.  She in fact received checks for exactly eight weeks from the date she was fired.  The last day of any pay period for which she was paid was in February 2008, exactly three years from when she had been hired.

## COUNT I

## UNLAWFUL TERMINATION PURSUANT TO FMLA

96. Plaintiff hereby incorporates by reference each and every allegation set forth in paragraphs 1 through 95 of this Complaint as though fully set forth herein.

97. As set forth in detail above, Plaintiff timely requested a leave of absence from Defendant BOA under the FMLA due to her pregnancy; Defendants treated Plaintiff adversely because of her request and subsequent to Plaintiff returning to work and Plaintiff was shortly terminated after her return to work.

98. Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

99. As a proximate result of defendant's discrimination against Plaintiff on the basis of his/her exercise of rights under the FMLA, Plaintiff has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

100.    As set forth in detail above, a further proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer impairment and damage to Plaintiffs good name and reputation by Defendants.

101.    As set forth in detail above, as a further proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish

102.    Accordingly, Plaintiffs are entitled to an award of monetary damages in an amount to be determined at the trial of the merits of this action, but in no respect less than One Million ($1,000,000) Dollars, as well as an award of costs, pre- and post-judgment interest, legal fees and punitive damages.

## COUNT II

## RETALIATION PURSUANT TO FMLA

103.    Plaintiff hereby incorporates by reference each and every allegation set forth in paragraphs 1 through 102 of this Complaint as though fully set forth herein.

104.    As set forth in detail above, Plaintiff notified Defendants of her need to take FMLA protected leave due to her pregnancy and subsequently took FMLA-protected leave.

105.    Plaintiff was discharged by BOA shortly after her return from FMLA leave.

106.    As described in detail above there is a causal connection between Plaintiff taking FMLA-protected leave and the termination.

107.    Accordingly, Plaintiffs are entitled to an award of monetary damages in an amount to be determined at the trial of the merits of this action, but in no respect less than

16

One Million ($1,000,000) Dollars, as well as an award of costs, pre- and post-judgment interest, including attorney fees and punitive damages.

## COUNT III

## DISCRIMINATION UNDER NEW YORK CITY HUMAN RIGHTS LAW

108.   Plaintiff hereby incorporates by reference each and every allegation set forth in paragraphs 1 through 107 of this Complaint as though fully set forth herein.

109.   As described in detail above, and pursuant to New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)(a)) Plaintiff has suffered discrimination based on her sex and gender at the hands of Defendants

110.   Plaintiff is a female and is entitled to protected group status.

111.   As detailed above Plaintiff was hired by Defendants, was a model employee, received salary increases and was promised bonuses based on her outstanding performances in the work place.

112.   Defendant's disparate treatment of plaintiff, including plaintiff's discharge from employment on the basis of her gender, was in violation of the New York City Human Rights Law.

113.   Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

114.   As a result of the foregoing, plaintiff has been denied employment; has lost wages, benefits, promotional opportunities and bonuses; has suffered mental anguish, emotional distress and loss of enjoyment of life; and has incurred damages thereby.

115.   Accordingly, Plaintiffs are entitled to an award of monetary damages in an amount to be determined at the trial of the merits of this action, but in no respect less than

17

One Million ($1,000,000) Dollars, as well as an award of costs, pre- and post-judgment interest, including attorney's fees and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief on the causes of action stated above Defendants as follows:

a.   On the First through Third Counts, that Plaintiff be awarded compensatory damages in an amount to be determined at trial and which is otherwise incalculable at this time but is not less than One Million ($1,000,000) Dollars;

b.   On the First through Third Counts, that Plaintiff be awarded punitive damages in an amount to be determined at trial and which is otherwise incalculable at this time but is not less than One Million ($1,000,000) Dollars;

c.   An order enjoining Defendants from engaging in the wrongful practices alleged herein and/or reinstating Plaintiff to her position.

d.   That Plaintiffs be awarded pre- and post-judgment interest;

e.   That Plaintiffs be awarded their attorneys' fees, cost and disbursements

18

      f.    That Plaintiff is awarded all other and further relief as the Court may deem

just and proper.

Date:  New York, New York
        August 11, 2008


                THE LAW OFFICES OF DWANE SMITH, PLLC


                By: _____
                   Dwane Smith
                236 West 26th Street
                Suite 303
                New York, New York 10001
                Tel: (212) 736-2624
                Fax: (212) 981-0528

                Attorneys for Plaintiff

19

Index No. _____ Year _____

SUPREME COURT
STATE OF NEW YORK, COUNTY OF New York

Anita Gupta,
Plaintiff

Bank of America Securities, LLC,
Doug Gallagher & Peter Spencer,
Individually

COMPLAINT

Dwayne Smith PLLC,
Attorney(s) for Plaintiff
Office and Post Office Address, Telephone
236 W. 26th St - Suite #203
NY NY 10001
212 736-2624

Signature (Rule 130-1.1-a)

_____
Print name beneath

To Defendant Bank of America Securities LLC
One Bryant Park
19th Fl
NY NY 10036

Attorney(s) for _____

Service of a copy of the within is hereby admitted.

Dated: 8/12/08

_____

PLEASE TAKE NOTICE:

☐ NOTICE OF ENTRY
that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on

☐ NOTICE OF SETTLEMENT
that an order
of which the within is a true copy
will be presented for settlement to the HON.
one of the judges of the
within named Court, at
on                          at                          M.

Dated,

Yours, etc.

SUPREME COURT
STATE OF NEW YORK, COUNTY OF New York          Index No.          Year

ANITA GUPTA,
Plaintiff

vs

BANK of America Securities LLC,
Doug Gallagher + Peter Spencer, Individually

SUMMONS

DWANE SMITH/ plc
Attorney(s) for    PLAINTIFF, Anita Gupta
Office and Post Office Address, Telephone

236 W. 26th St #303
NY NY 10001
212 736 2624

To                                    Signature (Rule 130-1.1/a)

                                      Print name beneath

                                      Service of a copy of the within is hereby admitted.

                                      Dated: _____

Attorney(s) for

PLEASE TAKE NOTICE:

☐ NOTICE OF ENTRY
that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on

☐ NOTICE OF SETTLEMENT
that an order                                    of which the within is a true copy
will be presented for settlement to the HON.     one of the judges of the
within named Court, at
on                        at              _ M.
Dated,